Page number 20-1079 et al. New Jersey Board of Public Utilities Petitioner v. Federal Energy Regulatory Commission. Mr. Sheerenbeck for the petitioner, Ms. Chu for the respondent, Mr. Townsend for the respondent intervener. Mr. Sheerenbeck, good morning. The floor is yours. Good morning, your honors, and may it please the court. This is a familiar administrative law case. An agency didn't meaningfully respond to critical arguments, and it thought its regulations could trump a statutory mandate. Those errors require vacater, and here they are particularly troubling, because FERC's failure to engage in reasoned decision-making leaves New Jersey ratepayers on the hook for hundreds of millions in costs for a project that was built in substantial part to serve New York, not New Jersey, and which continues to deliver important benefits to New York cost-free. I think there are really three distinct errors on review. First, in relieving Con Ed of all further cost allocations for the corridor project, FERC mistakenly thought that as long as its decision aligned with one piece of a FERC regulation, principle four of order number 1,000, it didn't have to ask whether its decision comported with its duty under the Federal Power Act to ensure that rates accord with the cost causation principle. Second, FERC's decision to allow Linden to escape cost rested on a flawed premise, namely that by converting its transmission withdrawal rights, Linden gave up important benefits like reliable service and the right to have PJM upgrade the grid to accommodate Linden's needs. But that conclusion turns on the failure to meaningfully consider a critical issue. By opting for firm point-to-point service at the same time, Linden did not give up those benefits. And third, this court has held that FERC must consider whether the total effect of its rate decisions adds up to an unjust result, not just the reasonableness of each subsidiary part. And here, FERC held just the opposite, that so long as each part of its decision was sound, it didn't have to look at that bigger picture, which saddles New Jersey with hundreds of millions of costs. And that error also separately requires FACETR. So I would begin with Con Ed. And the statutory duty is to conduct the cost causation analysis. And this court has said, and FERC itself, I think, has recognized that no one part of Order 1000 is sufficient to trump that statutory mandate. But if you look at- This case is about the imprecision or deviation, whatever you want to call it, from cost causation introduced by Principle 4 of Order 1000. And this court specifically upheld that in the South Carolina case. So to the extent the New York entities are- Con Ed is doing better than it would under pure cost causation. It's just because they're out of zone, their responsibility is limited by their contractual commitments. And their contractual commitment, their responsibility ends. Yes, Your Honor. And we're not making a general challenge to Principle 4. Its soundness is one of the competing principles that must be balanced in a cost causation analysis or a cost allocation analysis. It's that here, as applied, singular attention to that factor was inappropriate and irrational. What about the point Judge Cass has made about the contract itself? Isn't the contract crystal clear that Con Ed has no liability once it stops service? It is, Your Honor. And we're challenging that like you'd challenge any tariff provision. That's clear, but as applied, unjust and unreasonable. Well, wasn't part of that contract? Yes, Your Honor. But the settlement itself actually made clear that it wouldn't be treated under the extraordinary standards of mobile Sierra doctrine or as anything special other than an ordinary contract that would be subject to just and reasonableness challenge, which is why I think FERC didn't lean on the 2009 settlement as anything that required any kind of different sort of analysis here. So we're not disputing the 2009 settlement allowed this. And taking a step back as to why it is unjust and unreasonable to treat it this way and why Principle 4 doesn't get you the way there in relieving Con Ed of all costs. It's that here, the 2009 settlement mandated that PJM build upgrades to serve the Con Ed wheel. And so Principle 4 doesn't really address what do you do when one party is legally compelled to build the upgrades and then FERC simultaneously gives that other region the right to exit when it sees the bill. And maybe FERC on remand after this we'll start to think through how Principle 4 should apply to that unique factual circumstance, but it's the one that's teed up here. What is unusual about what happened here, right? I mean, we just had a very long argument about, you know, stability issues are different from flow issues. You can understand that. What is different? What happened here that makes this something other than just the heartland application of Principle 4 where the upper bound on liability is what's in the contract? One answer is that the settlement legally compelled one region to build projects to serve New York. And I take Principle 4 to be imagining voluntary contract. And here, of course, the settlement was entered into by all the parties, but it can't immunize for all time and in all compulsion to build the project and then having a right to unilateral exit. That's what, you know, as Con Ed saw fit, that's what really I think distinguishes this circumstance. Of course, if the corridor project could be abandoned, practically speaking, when Con Ed backed out, that might change the calculus. But that's another thing I think FERC would have to look at on remand. Here, the corridor project was already well underway and when Con Ed terminated. And I want to focus on the nature of the error in the decision because I think it's clear on the face of the order on review that FERC thought so long as Principle 4 was met here, it didn't have to do any other analysis. At the top of JA 153 in the rehearing order, it said that Principle 4 required the result of relieving Con Ed of costs. It talked about benefits to New York as being irrelevant and immaterial at JA 152 and JA 153. At the very least, you have to balance all the different principles of order number 1,000. And we think FERC failed to do that here. It also, FERC also said it wouldn't hold an evidentiary hearing to even consider those because they were irrelevant and immaterial. Yeah, the order does have language to that effect. But fairly read, it has an independent ground of decision. One ground is compliance with order 1,000 and that's the end of everything. But there is another independent strand of reasoning in this order, which is letting the New York entities out of responsibility is reasonable because they have foregone benefits and seems a little dicey as to Linden, but it seems pretty clear as to Con Ed. I agree on the benefits side that the Con Ed argument is weaker than the Linden argument. But on the burden side, the Con Ed argument is fairly strong. And at the very least, the commission didn't grapple with this question. I mean, the whole of the commission's analysis as to the extent to which Con Ed led to the creation of the corridor project is confined to a footnote, footnote 85, and on page 108 of the JA. And it says, PJM says, the corridor project would have been necessary even if there were no flows to New York. And then without endorsing that analysis at all, it says, so we can't agree that the bulk of costs are being stranded, which I think implies maybe some substantial part other than the bulk is being stranded. And that's the end of the study, counsel. FERC made a factual finding here, did it not, that the project would have gone forward without regard to the service into New York? I don't read the orders that way, Your Honor. I read the orders to allude to PJM's statement that they would have gone forward, but not to earlier statements that we cite in our complaint and in our brief saying that the corridor project was, you know, the substantial cause of the corridor project was these flows to New York and reconcile that with PJM's change of tune. You know, I would say at JA-263, PJM had earlier said fault current levels from the Con Edison system were a cause of the corridor project. And, you know, in the other proceeding that you just heard this morning, you have FERC saying, well, it's very difficult to determine who's the cause of a problem like this, but you had PJM earlier clear as day saying that the Con Ed system was a reason for it. And now you have FERC saying before you, well, we know the Con Ed system wasn't. And I don't know how to square all those things together. What I do know is you have to take a hard look at this issue if the reason for the corridor project was the Con Edison system, and that could be a reason why Con Ed needs to continue to carry costs. And I take the FERC's major response here to be that our argument is a collateral attack. I think that's wrong for three reasons. The first is that they didn't raise this collateral attack issue below and basic Chenery principles and this court has applied them directly in the context of the collateral attack doctrine require the commission to raise it. The second is that that prior proceeding was distinct. It was about whether the Con Ed wheel was continuing as is on the assumption that it ended. And the third is that there were ensuing events that made the board take this route. Namely, it was not until this complaint was only filed after it was clear that all the costs would not be reallocated from Con Ed to Hunsett and Linden, but onto New Jersey rate payers. You can maybe debate whether this is best characterized as a collateral attack issue or an administrative issue preclusion issue or something else, but the fact of the matter is you're attacking your own settlement here. And I would point you, your honor, to the JA 618 paragraph 28, which says that the just and reasonableness standard is going to govern all future disputes about the terms of the settlement. It says mobile Sierra doesn't apply. You're not going to treat this like some kind of special contract that deserves some kind of special weight and that the parties can bring challenges under the just and reasonableness standard, which I think is why the commission didn't make any kind of argument about mobile Sierra below. No, they did rely on the settlement. That's right, your honor. And our position is somewhat tautological because the settlement is just integrated into a part of the tariff. And it's like when the commission also says, well, the tariff allows Con Ed to escape these costs. Well, yes, that begs the question of whether it's unjust and unreasonable to apply the tariff here. And if there are no further questions on the Con Ed side, let's move on to Linden. Yes. And, you know, we think that the. The problem with the Linden analysis is that it leaves out an important part of the picture. If you consider that you have a strong argument on the merits, but walk me through where you spelled this out in your rehearing motion. Yes, your honor. So I would point the panel to pages 522 to 524 of the J.A. That's our rehearing petition itself. And I'd say we raised it. The commission understood we raised it, which is why they addressed it. Why don't you read the point that you're making? Absolutely. I don't know. I understand. So what we say I will what they say. Let me first say in your brief, you make the point that the agency responded to the notion that you're raising. So therefore, that's implicitly an indication that you raised it. That's not quite logically true. What Firk made was a statement, but it's not a statement that was ever challenged by you. A statement concerning Linden. But I didn't see that making the same point my colleague is. I didn't see where you challenged the interrelationship between the point, the point concept and payment and the withdrawal. Yes, your honor. So I think we have three answers. And again, it's the specific language, the fact that the commission understood that we raised it. Please read. Please read. And I will. I don't see that. I don't see the commission's response as an indication that they understood you raised it. They just made that statement. And where did you where did you actually raise it? Yes, your honor. So what we say and this at first on page 522, we talk about New York ISO statements about continued transmission, reliability and resource adequacy benefits. At 523 and 524, we say New York ISO has even acknowledged that amendment of the that's the contracts that issue here for Linden and the continued to PJ connection to PJM does not limit New York from receiving reliability and capacity benefits via merchant tie lines like Linden. Yes, but that doesn't go to your much more sophisticated arguments that you make in your brief concerning the interrelationship between the point and the withdrawal. So what I would say, your honor, is we make the argument you make the argument in the brief that the change from firm to non-firm withdrawal in light of the point was really irrelevant in terms of benefits. I didn't see that in the re-hearing and I certainly didn't see it in the FERC's response to your hearing. So what I would say, your honor, is when we're talking about the acknowledged continued reliability and capacity benefits, that is this argument about point-to-point service. And then that's where I would transfer your honor's attention, if I could, to the order itself on re-hearing where the commission understood what we meant and then specifically addressed it in this context. Now remember, we're the only party that filed for re-hearing. So the board, the commission is responding to the board's arguments and it said, the commission explained that merchant transmission facilities with non-firm TWRs do not receive the same service and benefits because PJM can curtail or interrupt the withdrawal service for reliability and economic reasons. Irrespective- What page are you reading from? J151, your honor. It's paragraph 13. It's in that second sentence. Irrespective of the priority of any upstream firm transmission service. So that's upstream firm transmission service. That's exactly what we're talking about. They made a statement. They made a statement, but it's one that you did not challenge with the rather elegant argument you put in before us. Well, I appreciate the compliment, your honor, but I think that I respectfully disagree about what was before the commission and that the commission understood the argument to be made. Because if you then go down to footnote 25, which is the footnote that follows this allusion to firm transmission service, you'll see the commission is saying the possibility of Hudson and Linden receiving capacity benefits from New York ISO is outside the scope of this complaint. That's the argument we're making on 522 and 524, that you have to look at the capacity and reliability benefits that Linden is still getting through New York ISO. And even if your honor thought, look, they didn't say point to point exactly. So I'm going to close my eyes to point to point. If that's where you were, I wouldn't go there. You'd have to agree that what we raised was the fact that Linden can continue to sell capacity in New York ISO. And the commission said, we don't have to look at that at all, because that has to do with New York ISO's tariff. And I would submit, your honor, that's irrational because an MTF exists between two markets. And to close your eyes in a cost causation analysis to the selling market altogether is to ignore a really critical piece of the cost causation analysis. So even if you thought that- Let's assume that you hadn't even the argument that you make before us. And FERC was only operating on the assumption that non-firm withdrawal was different because PMJ could reduce the withdrawal at any time. That could still allow Linden to sell in the capacity market, right? We don't know about that. That's a question for New York. Hypothetically, but it's the why. It's the why that really gets you there. And if you look at page 1042- In other words, one of my question is that could have been true even if your argument hadn't been made. In other words, it depends on the rules in the capacity market. And even if, for instance, Linden was not totally reliable because its withdrawal rights could be curtailed at a certain time, New York might decide it's still worthwhile to take them into the capacity market. So it I would say two things, Your Honor. One is that, yes, of course, it depends on the structure of the New York ISO market. But if you're looking at the benefits that Linden receives from these rights, that to close your eyes totally to the benefits they receive in the New York ISO market is unjustified or at least unexplained here. And then second, if you look at the why New York ISO agrees that they can continue to sell capacity into the New York market, you'll see it's because everything the commission said about the effects of conversion are wrong. And I just want to point you again to J151 and that footnote 25, the independent power producers case that they're citing in direct response to the board's argument. In that proceeding, New York ISO says clear as day that conversion by Linden doesn't affect the reliability of the service they receive. Let me ask you a practical question. If the decision had been contrary to the decision that FERC made and Linden was, the cost to Linden overwhelmed its revenue, wouldn't Linden have been bankrupt almost immediately? That may be right, your honor. Although, you know, whether Linden can continue as a going concern sort of, it might just be that they can no longer buy really cheap power and sell it into New York. I mean, that's, you know, sometimes you are a market participant and things don't work out, but that would be their argument as to the measure of cost allocation. I recognize that's the real world, real people rather than a legal argument. But I was wondering if putting this cost on Linden would be like trying to get water out of a stone. Well, they really, look, it depends on how badly New York wants this power, I suppose, and what Linden's actual contracts say. Because if the costs of buying the power in New Jersey go up, but New York still really wants this power because there's a voracious desire for power, well then, you know, maybe those contracts will be negotiated and Linden will keep going. Is this a relevant consideration at all? I think it would be. Linden would have gone broke pretty quickly. I think, your honor, it would be relevant potentially to the measure of costs that Linden is going to bear, but not whether converting its rights is an on-off switch for those costs. Mr. Schermak, can I ask you another question on the, maybe it's more to the merits of your argument. FERC suggests that for point-to-point transmission, there are some baked-in costs of upgrades. So by, you know, so when Linden makes these point-to-point contracts, they are in fact contributing to the cost of upgrades through, you know, through those. So maybe, you know, if you could respond to that. Absolutely. I think FERC and the intervenors pointed to other kinds of costs rather than the transmission enhancement charges that we're actually debating here. And we think they're both distinguishable. There's the upfront costs that a merchant like Linden pays when they interconnect to the grid. I would point you to opinion 503 at JA733, which distinguishes those upfront costs from the sort of ongoing costs that one has to pay to ensure reliable service in the regional plan process. And then as to the border rate, which is the rate attendant to point-to-point service, that rate bakes in a kind of generalized cost sharing of regional plan upgrade costs across the whole grid. So a utility in Ohio would be paying some fraction of the cost of the generally mutually beneficial. But what it doesn't do is allocate any of those direct costs. And so it's to say they're paying some fraction of these costs through the border rate attendant to point-to-point service just isn't directly responsive to whether they should pay a share of the direct costs as a direct beneficiary. And so is it, I mean, just as a, just so I understand the baked in cost, what you're saying is a very small percentage compared to what the Yes, your honor, because it's distributed across the whole grid, everybody in PJM, I should say, then it's just a fraction of the cost they would pay if they're being analyzed as a direct beneficiary of the project because their flows go right over it. And so, you know, and in fact, I'll just point you to, there's also an illusion, I think, by intervenors to an ongoing proceeding that covers the point-to-point service. And they say, look, if you have a debate about paying more, go take it down that line in the point-to-point service proceeding. But in that very proceeding, I'll point you to 177 FERC 63027. The ALJ has determined that transmission enhancement charges, that is the exact same thing we're talking about here, are outside the scope there. And so there's a bit of like a shell game going on where every single proceeding where the board raises these objections, FERC determines it's not the appropriate place to raise them, which is why we brought a holistic challenge to try to get at the totality of this question, which is the stranding of costs in New Jersey. If there are no further questions, I'll save what time I have for rebuttal. Traf, Judge Silberman? No questions. We'll give you a few minutes. Thank you. Thank you. Ms. Chiu. May it please the court, Susanna Chiu for the commission. Judge Katsas, Judge Silberman, you're exactly right that this case is about contract principles. When you make a comment that the commission is not just taking a narrow view of Order 1000 here, the commission actually did take a holistic view of what was happening here after the parties that challenged the cost allocation in the first case decided to exercise their contract rights and surrender firm transmission rights that had been the triggers for the cost allocation. Well, the contract point is very powerful to you on Con Ed, but I don't see how it moves the needle on Linden because one of the orders that we have before us is one in which FERC changed the underlying contract commitments to allow them to convert from firm to non-firm withdrawal, which may be a perfectly fine thing to do, but it just means you can't assess the reasonableness of what's going on here just by saying, well, look at the antecedent contracts. A couple of points to that, Your Honor. Go ahead. I have a point I would like to make in connection with that. Go ahead and answer Judge Katsas' question. Right. So the underlying form contract, the commission determined there that it would not be just and reasonable to hold Linden, to require it to continue to pay for service that it no longer wanted. This is a market and here these are business entities making judgments on a daily basis. And here the commission held that it's not just unreasonable to hold a business to require it to continue to pay for a service that it considered to be too expensive. Now, it's also important to remember that New Jersey Board of Public Utilities did not actually challenge that conversion. Yes, that's the point I was about to get. You claimed in your brief that that was not legitimately before us because you made a separate decision to allow the shift from firm to non-firm and the petitioner never appealed. Right, Your Honor. In our brief, we did discuss that. The petitioner... What FERC seems to do is slice these cases up in a little very slice, now slices of salami, and nobody knows what the overall complications are. Is that a strategy on the part of FERC to make it... No, of course not, Your Honor. It's not a shell game. We're not slicing up these cases. This was an extraordinarily complex set of cases, of course, dating back to 2015 or even earlier. When you made the decision to allow Lyndon to switch from firm to non-firm, was it your view that the implications on that for cost were all before everybody and therefore implicitly suggesting petitioners should have objections? Yes, Your Honor, that is right. The commission made the decision to allow the conversions in the orders underlying the petitions in case numbers 20-1080 and 20-1081, but the New Jersey Board of Public Utilities, in its request for a re-hearing, is generally challenging the outcome, the fairness. They don't like the outcome, and the commission has considered throughout all of these proceedings and in the orders on review here, the actual outcome of these market rules. At the end of the day, the commission concluded that it was not unjust and unreasonable after the New York entities had already paid some significant amounts towards these upgrades. It was not unjust and unreasonable for New Jersey to bear the cost for upgrades that PJM had decided were needed, and they're necessary whether or not there were flows over these transmission lines to New York. My understanding of petitioners' position is they didn't object to the change from firm withdrawal to non-firm withdrawal because the cost implications were not obvious at that point. Is that correct? I think that that may be. I'm not exactly sure when petitioners believe that the cost implications were obvious, but in the commission's view, the cost implications were actually years ago, going back to the settlement agreement between Con Edison and New Jersey. You're not taking the position that there's collateral estoppel here? This is an unfair collateral attack. Are you taking that position? We do actually believe it is an unfair collateral attack. Of course, we rest on the fact that the is just unreasonable, and the commission did make factual findings on this. As Your Honor was pointing out, the factual findings that these upgrades were required, they were needed in PJM, regardless of flows to New York. But yes, we are also making the collateral attack argument because this case does not arise in a vacuum. It arises against a whole series of orders addressing these contracts. There's a real problem that we've seen with respect to whether petitioner has legitimately raised before the agency in a rehearing petition the rather interesting and persuasive argument they make before us. But let me ask you about the merits on that. Is it fair to say that the shift from firm to non-firm, given the obligations on point to point and the benefits from point to point is really an illusion? That is to say the notion that with a non-firm withdrawal arrangement, the Linden is really prejudiced in a position they would be in, not being in a firm withdrawal. They make the argument just that with the point to point, it doesn't really matter. What's the answer to that? Well, so two things, Your Honor. Yes. First of all, the argument absolutely is waived. It's nowhere in New Jersey's rehearing request. Indulge us. Just discuss it on the merits. Yeah. Yes, Your Honor. So on the merits, the commission did find that there is a difference between firm and non-firm withdrawals. PJM no longer has to plan for these megawatts going over its lines to Linden, Hudson, and Con Edison. Linden relinquished valuable rights in this case. I don't understand why PMJ no longer has to plan if in fact the non-firm withdrawal rights give Linden everything they really had before. It's just a change of insignificance. Then why wouldn't PMJ have to plan for it? Well, the commission actually found that it does not give Linden everything that it had before because PJM can actually curtail those flows as needed. They can interrupt those flows. The commission absolutely did find that. Actually, the independent power producer's case that Mr. Scherenbeck has referred to, the commission did find that it is the New York system operator's decision how to treat the power flows that are moving from New Jersey into New York. But FERC, from its perspective, the power flows, the withdrawal rights are not the same. Also, the commission did find that for this point-to-point service, Linden, Hudson, and other parties, they do pay a share of PJM upgrade costs as part of that. That's in the complaint order at paragraph 57, JA111. Incidentally, counsel, what's the status of Hudson in this case? Are they on appeal? Are they here before us? It's a little puzzling. I understand the question, Your Honor. Mr. Townsend will speak on behalf of Hudson, but our position is that New Jersey has waived all its arguments against Hudson. It has barely made any arguments about it throughout the opening brief. The brief seems to challenge Con Edison and Linden's lack of cost responsibility, barely mentions anything about we understand it. Can I ask you about the independent power order? Yes, Your Honor, of course. It seems a little bit hard to parse, because on the one hand, FERC does repeat this point that if you have non-firm withdrawal rights, those can be curtailed regardless of priority of the upstream transmission, point-to-point rights. On the other hand, the New York ISO, its argument is not, gosh, these rights have been degraded in New Jersey, but they're good enough for us to allow the company into the capacity argument. That is not into the capacity market. That is not what they say. What they say is that the combination of firm point-to-point service and non-firm withdrawal rights is the same as having firm withdrawal rights. FERC embraces that, at least to the extent of saying it's reasonable enough to uphold their decision. Right, Your Honor. I think you're looking at this decision, JA1051. The commission discusses this. I think the bottom line is that it is New York's decision, the system operator's decision, as to what level of firm transmission right is sufficient to be considered capacity in its market. The commission also says that we correctly previously recognized that non-firm transmission withdrawal rights can be curtailed. They can be curtailed before a firm transmission withdrawal can be curtailed. So- Which is to say that the commission disagrees with New York's position that point-to-point, and now I'm just quoting from FERC's summary of New York's position, the New York ISO's position at 1042, you say their position is that what Linden now has is no different than long-term firm transmission reservations, which could only be curtailed as a result of a level five event. Yes, I see that, Your Honor, but that's where the commission is just reciting the New York system operator's opinion. So the commission's opinion is really- But then the question is, are you accepting that or not? And- We are accepting it as the New York system operator saying it's adequate for its purposes. And this actually does lead to the border rate litigation that Mr. Schoenbeck mentioned. Mr. Hoffman- Sorry, I keep interrupting you, but I'm just having real trouble with this, because their theory for why it is sufficient for their purposes is that it's just as good as what Linden had before. Right. I think that their position is that because the firm point-to-point is firm, the transmission service within PJM is firm, even if the withdrawal right is not firm, that's sufficient for New York's purposes. And that's really an answer for to provide, for the system operator to provide. They have decided it's sufficient. Excuse me, counsel. Is your response that New York simply thought this was good enough for a capacity market and FERC affirmed that as a legitimate judgment? Yes, Your Honor, exactly. But it may be good enough for the capacity market, but not necessarily perfect, that it could be curtailed. So you didn't, did you ever say that FERC, that New York was correct to say firm withdrawal and non-firm withdrawal were equivalent? Did New York say that? And did you approve that? No. Do you understand my question? I believe I do, Your Honor. And I think you're exactly right, if I understand you correctly. You're right that New York never said that a firm transmission withdrawal right is the same as a non-firm withdrawal right. But it did say that combined with the firm point-to-point service, that was adequate for purposes of the New York system operator. And the commission did find that that's a legitimate judgment for the New York system operator to make. Have I answered your question, Your Honor? I think so. How important was it to FERC that Linden would have gone broke pretty quickly if you imposed the costs that petitioner wanted? I think that must have factored into the decision, Your Honor. But really the commission's conclusions here are based on the operation of the contracts and of the Order 1000 principles. The contract, as my colleague, Judge Katz has pointed out, is really relevant vis-a-vis Con Ed. Not so much Linden. Right? Right, Your Honor. But in addition, I've only touched on it briefly here, but we briefed there are prior orders of the commission that basically spelled out what would happen if New York entities relinquish these rights. And we discussed it in a brief, but it's the 2017 joint operating order and the 2019 rehearing order in which we discussed the impact of Con Opinion 503, which was cited in the orders, where the commission found that, this is actually going back to 2009, that if a merchant transmission facility converts from firm to non-firm, that they would no longer be responsible for these transmission upgrades in PJM. So all in all, the commission here was looking at everything that had happened before and in the course of this case. And it did conclude at the end of the day, Judge Silberman, you were right, that the commission made the finding that PJM had determined that these upgrades needed to be built. It was absolutely critical for reliability that they be built. I know Mr. Schierenbeck actually referred to a page in the joint appendix to talk about how fault currents from New York may have caused the short circuits, that JA263, but that's, I believe, just a page in New Jersey board's complaint. The commission never made that finding. Now, there's one last thing I'd like to touch on. I believe Mr. Townsend may speak more about this, but regarding the firm point-to-point service, the argument has been waived. However, that rate that has been discussed, the border rate, that actually is subject to a pending proceeding before FERC. There has been a settlement that was certified by an administrative law judge in December of 2017, under which the rates to certainly Linden, possibly Hudson as well, the rates for that point-to-point service will increase. That was a negotiated settlement between transmission owners and Linden and Hudson. Does that encompass the kind of tech transmission enhancement charges that we're talking about? It does. It does include different categories of costs. Right, Your Honor. It does incorporate these transmission enhancement charges, not to the extent that, perhaps not to the extent that New Jersey- No, but it's a category of cost that you think is at issue in that proceeding. My understanding is that it is. I do want to caveat that the settlement has not yet been approved by the commission, so the commission hasn't spoken to it, but my understanding is at least the New York parties view those costs as being part of that border rate. I'm getting the impression these first decisions in these cases are like a Faulkner novel. They just go on and on and on and on with the occasional orders being issued on which parties have to appeal and you never put together the whole thing in one proceeding. Then you end up with different panels of the Court of Appeals deciding different parts of this. This is what I meant earlier when I said you seem to be slicing the salami very thin. Larry, you don't want this appeal to get bigger, do you? I think it's a good question. I think what happens is the same issue comes up in such a minor different way. It's not technically the same issue, but it's the same basic problem. Any further questions from my colleagues? Thank you, Ms. Chu. Mr. Townsend, last but not least. Thank you, Your Honor. I may please the Court. I'll begin with where we just ended on the border proceeding. There is a separate proceeding in which all of the parties here are participants and there is a certified settlement. The border rate goes up 300% for the merchant transmission facilities. It's a very significant increase under the certified uncontested settlement. That increase, 100% of it, pays for regional plan costs, including the border rate. It is simply not true that Linden is not paying for the corridor project. How much cost are they paying compared to their revenue? That, Your Honor, I don't know the dollar amount. I know it goes up 300% over what it was, and so it's quite a substantial increase. At the end of a seven-year period, it's much higher than that as well. That was specifically put forward by the transmission owners after the merchant facilities gave up their firm transmission withdrawal rights, specifically to capture the cost of the corridor project and other regional plan projects. So this isn't a loophole. In fact, this was specifically identified in Opinion 503 back in 2009. I point to the Court to footnote seven of Opinion 503. It's at page JA-722, and it states that merchant transmission facilities can give up their firm transmission withdrawal rights and separately take firm point-to-point service if they pay for it. Linden is paying for it through the border rate. If the Court reaches the merits of the issue, that would be the answer. We don't think the Court gets to the merits because of the jurisdictional bar. Mr. Townsend, is it your view basically that the settlement is, to the extent there's a loophole, the settlement is closing up that loophole? Your Honor, I wouldn't agree that it's a loophole. This is something that has been identified since 2009, that merchant facilities can take different services if they'd like as long as they pay for them. So it isn't a loophole, but to the extent transmission owners think that there's an underpayment, they are getting those costs through the border rate. Counsel, may I ask a question? How long has it been since, in time, since the FERC order that's being appealed here that gave you, whereby you switch, or maybe even the earlier order, when you switch from a firm withdrawal to non-firm withdrawal, how much time has there been? It was in December of 2017 that the merchant facilities gave up their firm transmission withdrawal rights. Has there ever been an occasion where your withdrawal rights have been curtailed? I don't know if actually there has been an occasion. That would be up to PJM, because the merchant facilities are- Yes, but it's also up to you. You'd know about it, of course, wouldn't you? My question is, goes to the proposition that the change from firm to non-firm is an illusion. Well, so two points, your honor. With respect to Hudson, Hudson has only non-firm rights. Non-firm transmission- Is Hudson before us? We think that New Jersey has waived its challenge with respect to Hudson. It has not identified any issues with respect to the Hudson order. Yes, I think you're right about that. So, I don't see why you're even talking about Hudson. Only because they're differently situated. I'll go to- Just ask about Linden. With respect to Linden, there is this argument that there's a pairing of non-firm and non-firm- Has there ever been a circumstances where the withdrawal rights were curtailed? I am not aware of a circumstance like that. That would be up to PJM, because PJM controls Linden. And so, Linden is a- But also, it would be up to Linden. You're representing Linden, so you would know, wouldn't you? Well, there's nothing in the record to talk about the factual history, your honor, but I would just say that it's PJM that controls Linden and whether service is curtailed over Linden. So, if there's an emergency, a blackout, PJM would have the ability to control the Linden facility. Whether that's happened since 2017, I'm sorry, I couldn't tell you, your honor, whether that's happened, but it could happen. You make a good point. It's not part of the record, but I was just curious. Yes. And so, again, if the court reaches the merits, I think the opinion 503 and the border rate completely answer the objection here. Again, I would just say with respect to the jurisdictional issue, there were two paragraphs in the complaint order that discuss New Jersey's pairing argument, paragraphs 58 and 59. You will find those paragraphs mentioned nowhere in Linden, in New Jersey's re-hearing petition. They're never cited. Other paragraphs around it are cited, not these paragraphs. New Jersey did not press this argument on re-hearing. So, we think there's a jurisdictional bar. Just very briefly with respect to Con Edison, the court has recognized that there are very clear contractual rights here that Con Ed exercised. New Jersey agreed to them back in 2009. Con Ed is not liable for cost allocations after its term of service, and its term of service naturally expired in April of 2017. There is, under clear language of the contract, there is further cost allocation. Con Ed is not a customer of PJM today. With respect to the New York ISO, it had never agreed to pay for regional plant costs in PJM, and it had no notice that it might be liable for the cost of the corridor project. An involuntary allocation here to another region would be unprecedented, and it would be contrary to principle four of opinion of order 1000. And it's certainly not supported on the record here, because the record shows that this project would have been needed to fix a New Jersey problem regardless of power flows to New York. And I specifically direct the court to pages 460 to 465 of the joint appendix. PJM put in very detailed evidence showing that this project would be needed regardless of any power flows to New York. Even if those flows were zero, this project would have been needed. And so there is just no record here, and New Jersey put in no evidence to the contrary. There's no record that would support an involuntary allocation to another region. Yes, Your Honor. Just back to Lyndon for a minute. So you agree with FERC's current position, which is that for New Jersey purposes, when Lyndon downgraded its withdrawal rights from firm to non-firm, but simultaneously upgraded by a third, but for purposes of the New York tariff, not giving up enough to prevent New York from reasonably saying your rights are still good enough to permit you to sell capacity in our markets. You agree with all of that? I agree with that, Your Honor, with one small point, which is I don't think it was simultaneous. I think Lyndon took firm point-to-point service at a later date. But yes, I agree that conditioned on the downgrade of the withdrawal right. That's correct. And there was, as the court has recognized, there was a proceeding in which New Jersey was a party and did not seek judicial review, the New York capacity proceeding. So what is in that delta? I mean, what is Lyndon giving up that matters, that could conceivably matter to Lyndon, if not the ability to sell energy and or capacity in New York? Just the intuitive argument on the other side, this is not an all-purpose energy company. This is a facility very specifically designed to transfer power from New Jersey to New York. Well, I don't think we had the answer to the New York capacity proceeding when Lyndon gave up its firm transmission withdrawal rights. So there was certainly a question as to whether Lyndon could sell capacity into New York. But these are two different services, the firm transmission withdrawal rights and the firm point-to-point service. They're subject to a different set of rules, different schedules in the tariffs. They're not necessarily identical services. And the proceeding in New York about capacity was just to consider whether what Lyndon can provide is sufficiently firm for sale in the New York capacity market. And that turns on a number of factors, benefits from interconnection and reliability benefits, the fact that PJM can control the Lyndon facility. These were part of the rationale in the New York ISO proceeding. So based on all of that, determined that it was not arbitrary, the New York ISO properly determined that they were sufficiently firm under the terms of the New York ISO tariff. But again, that wasn't a foreordained conclusion. New Jersey was making arguments in that proceeding and didn't seek judicial review. So there was certainly some risk here on Lyndon. Okay. Judge Rao, anything else? Judge Silberman? No. Okay. Thank you, Mr. Chairman. General Schierenbeck, rebuttal? Thank you. Just a few points. I know it's been a long morning that are directly responsive to what we've heard. The first, Judge Silberman, on the question of Hudson, the reason why we did not spend much time on Hudson in our brief is because they're not pairing, but Lyndon is. And so that's the reason why you're not seeing much about Hudson except in our totality argument at the end of our brief. Now, I hear the commissioners may have given two rationales for why allowing Lyndon to escape costs after conversion made sense. One was that PJM no longer had to plan for Lyndon. But what we can see in PJM's own manual, 581 to 82, is that they continue to plan for Lyndon just as they did before. We also know that PJM said now Lyndon's service can be curtailed. And the specific thing they said was that as a result of this conversion, they will be curtailed according to level three standards. But what we know is that they will in fact only be curtailed to level five standards, which is the same as it was before. And that's what NISO said in the independent power producers order. And that is what NISO and PJM were explaining even in the order below. Now, to the extent that fact was only made crystal clear in the independent power producers order, that order came out after New Jersey filed for rehearing. So New Jersey would have had no opportunity to point to that specific statement in its rehearing petition. And I'm aware of this court's case law saying sometimes there are arguments that only come to fruition upon rehearing. And you don't fault a party for not raising an argument anticipating an event that didn't occur in its rehearing petition as a result. So that's another way of thinking about that waiver issue. Isn't that really, that's an evidentiary question or a factual question that would support the argument, but still the argument could well have been made at the time you filed for petition for rehearing. You didn't need New York, the decision in the New York capacity market question in order to make that argument. It's a fair point, your honor. I would say it's factual. It's also goes to the reasoning on the face of FERC's order, but I think we did raise it in our allusion to the continued reliability and capacity benefits that New York ISO had itself talked about in the orders on review. And to the extent I heard the commission say that our Linden challenge is a collateral attack on the Con Ed order. I hear that if that's what they're arguing, I think that's a new argument. I don't understand how that could possibly be true. That proceeding that was about the sort of operational base flow and whether that was a continuation of the Con Ed wheel was neither here nor there as to Linden. And we could not have anticipated that Linden would try this unique maneuver and be believed of costs at that point. And opinion 503, which I also heard the commission talk about can't be dispositive on that issue either because opinion 503 occurred in a specific factual context, which is every merchant like Linden held firm TWRs. It's not until Linden tried this gambit that this situation ever arose. And finally, as to the border rate proceeding, I again just want to point the court to 177 FERC 63027 and in particular paragraph 88, because they're in the border rate proceeding that they're alluding to and saying that's going to deal with these transmission enhancement charges, the ALJ has said transmission enhancement charges are outside the scope of that proceeding. So what you have again is FERC deciding every time a party brings a challenge to get at the core issue we're bringing up at Linden, the commission's answer is, well, I understand that's an ALJ decision that hasn't been adopted by the commission yet. So I don't want to overstate the matter, but what you find is FERC saying, well, that's outside the scope. We just can't look at that. And so that's why we brought a consolidated challenge, Your Honors, and we think it's properly before the court. If there are no questions, we rest on our papers. Thank you very much. Thank you. The case is submitted.
judges: Katsas, Rao, Silberman